TEXTILE BANKING CO., Inc., Plaintiff,

v.

COLONIAL CHEMICAL CORPORA-
TION, Defendant.

Civ. A. No. 1648.

United States District Court
N. D. Georgia,
Rome Division.

Nov. 9, 1967.

Nolan B. Harmon, Harmon & Thackston, Atlanta, Ga., for plaintiff.

E. Lewis Hansen, Candler, Cox, McClain & Andrews, Atlanta, Ga., for defendant.

## ORDER ON DEFENDANT'S MOTION TO DISMISS

SIDNEY O. SMITH, Jr., District Judge.

This is a suit in which plaintiff seeks to recover $17,527.67 plus interest and attorneys fees. upon a certain factoring agreement entered into between the parties. The particular indebtedness at issue in this case comes from accounts receivable created by the sale of defendant's products to Spenser Rubber Coating Co. of Dalton, Georgia. The accounts receivable were subsequently assigned and sold to plaintiff under the factoring agreement between plaintiff and defendant. Suit was filed on February 26, 1965. In an order dated October 4, 1965, this Court characterized this case thusly. "* * * [T]he file indicates a chronology of discovery and counter-discovery running rampant. Apparently sufficient effort has been expended on the preliminary skirmishes to have fought the main battle several times over." Subsequent developments have shown the latter to be a mild understatement. Defendant now moves that this Court dismiss[1] the Complaint with prejudice on the following grounds: (1) lack of capacity to sue in this Court; (2) failure to file an intangible tax return with the Georgia Revenue Department; (3) failure to obtain a permit to commence business with the Georgia Superintendent of Banks.

The most troublesome of defendant's arguments in support of this motion to dismiss is the argument that plaintiff lacks the capacity to sue by virtue of its

---

1. Because of the use of affidavits, this Court treats this motion as a motion for summary judgment. Rule 12(b) provides:

    If * * * matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 * * *

failure to qualify to do business in Georgia.

■ Rule 17(b) of the Federal Rules of Civil Procedure provides that: "The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized." But there is a rather important qualification of this general rule. In a case involving local law and not federal law, under the rule of Angel v. Bullington, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832 (1947), the plaintiff must have an enforceable remedy in the state in which the federal court is sitting before the plaintiff is entitled to relief in the federal court. Professor Moore explains the rule in this manner.

> While technically the corporation may have capacity to sue in the federal court pursuant to Rule 17(b) it cannot recover where recovery would not be possible in the state court. Any valid state law closing its courts to a foreign corporation which is not qualified to do business in the state, must, therefore, be given effect in the federal courts of such state in a case based solely on diversity or alienage jurisdiction. To this extent Rule 17(b) has been qualified.

3 Moore's Federal Practice ¶17.21 at 1397 (2d ed. 1967). The Georgia law[2] applicable in this case is Georgia Code § 22–1501 which provides:

> Recognition of foreign corporations. —Corporations created by other States or foreign Governments shall be recognized in the courts of this State only by comity, and so long as the same comity is extended in the courts of such other States or foreign Governments to corporations created by this State.[3]

Under this code section the test is not whether a foreign corporation is doing business in this state but rather the test is whether the state in which the corporation was incorporated would allow a Georgia corporation in the same position to bring suit in that state.[4] If such an action could be brought then the Georgia courts will allow the action in its own courts but a negative answer would mean that the Georgia courts would refuse to allow the suit to be entertained.

In order to answer the ultimate question of capacity to sue, it is first necessary to examine with a greater degree of particularity the activities or lack of activities of Textile Banking Company in the state of Georgia. The volume of prior discovery in the instant case makes impossible a complete restatement of all the material on this point. The affidavits of David W. Johnson tendered in support of plaintiff's position indicate the following:

(1) Textile Banking Company does not and has never maintained an agent, office, or place of doing business in Georgia.

(2) Textile Banking Company has never maintained a bank account in Georgia.

2. The theoretical underpinnings justifying Professor Moore's assertion could be the subject of a detailed and highly complicated discussion. *Angel* was in part based upon the "outcome-determination" test set forth in Guaranty Trust Co. of New York v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). The particular factual background of this case would not involve the further refinements of the *Erie* doctrine contained in Byrd v. Blue Ridge Rural Elec. Cooperative, Inc., 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958). Suffice it to say that Professor Moore's assertions as to the binding effects of valid state laws on the operation of rule 17(b) are correct. See Woods v. Interstate Realty Co., 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524 (1949) for a decision supporting a similar position.

3. The parties have raised no direct question as to the validity of this Georgia statute. Any ramifications of plaintiff's interstate commerce contentions of this general observation are dealt with in footnote 5 infra.

4. For this reason many of the cases cited by the parties on the Georgia law on this issue are not discussed. These cases are not to be relevant. The relevant inquiry is the manner in which the New York courts would treat a similarly situated foreign corporation in their own courts.

(3) Textile Banking Company has never held title to any real or personal property within Georgia "other than that title necessary to secure an indebtedness such as the title conveyed under the laws of this state by a bill of sale to secure debt or a deed to secure debt or other assignment."

(4) Textile Banking Company does not maintain any personnel within Georgia to service its loans, "nor does it have any connection with any other corporation, nor is it using any other corporation within the State of Georgia to service any of its loans, all of said loans being serviced by it at its offices in the City of New York."

Two other assertions or more precisely conclusions are made in these affidavits which are controverted by defendant.

(5) "As a matter of routine, no periodic visits are made to this state by any officers, directors or employees of Textile Banking Company" to service these loans.

(6) All transactions between Textile Banking Company and Colonial Chemical Corporation were interstate in nature since all contracts were subject to final approval at the New York office and all accounts were serviced in New York.

Plaintiff characterizes its visits to Georgia as "infrequent and occasional," while defendant would characterize them as "regular and systematic." Defendant points out that in the two years preceding February 28, 1965, 20 different employees and agents of plaintiff visited in Georgia on 98 separate visits for the following purposes—collateral appraisal, appearance as witnesses, review of credit lines, customer-client relations, collection, appearances as legal counsel, foreclosure, and attendance of creditors' meetings. See Affidavit of David W. Johnson, dated October 18, 1967. Defendant also stresses the admission that Textile Banking had loaned substantial amounts of money to Georgia corporations, specifically on December 31, 1963, $3,085,800. was owed by Georgia clients to Textile Banking Company, and one year later $1,912,200. was outstanding.

Section 1312 of the New York Business Corporation Law, McKinney's Consol. Laws, c. 4, provides:

Actions or special proceedings by unauthorized foreign corporations.

(a) A foreign corporation doing business in this state without authority shall not maintain any action or special proceeding in this state unless and until such corporation has been authorized to do business in this state and it has paid to the state all fees, penalties and franchise taxes for the years or parts thereof during which it did business in this state without authority.
\* \* \*

(b) The failure of a foreign corporation to obtain authority to do business in this state shall not impair the validity of any contract or act of the foreign corporation or the right of any other party to the contract to maintain action or special proceeding thereon, and shall not prevent the foreign corporation from defending any action or special proceeding in this state.

██ It is obvious from the above cited statute that the next inquiry relates to the meaning of the phrase "doing business" as has been construed by the New York courts. As a preface to this inquiry, defendant correctly points out that the use of the phrase "doing business" is used in three distinguishable contexts: (1) jurisdiction over foreign corporations, (2) taxation of foreign corporations and (3) regulation of foreign corporations (qualification). Keeping these distinctions in mind may help to avoid unnecessary confusion. Another introductory comment, which might well prove controlling, is also in order. The New York decisions make clear that there is a presumption that when a foreign corporation brings suit and sets forth a valid cause of action, it is rightfully in the state and properly in the court. National Merchandising Corp. v. Powers, 8 Misc.2d 881, 168 N.Y.S.2d 507; William L. Bonnell Co. v. Katz, 23 Misc.2d

1028, 196 N.Y.S.2d 763; Suss v. Durable Knit Corp., 4 Misc.2d 666, 147 N.Y.S.2d 363. Accordingly, under the New York laws it is apparent that the burden of proving that a corporation must qualify before it can sue in the state courts is upon the party attacking the corporate status. See 23 N.Y.Jur. § 96.

The New York decisions start with the elementary proposition that the question of "doing business" is a question that must be determined on the particular facts of each case. Sterling Novelty Corp. v. Frank & Hirsch Distr. Co., 299 N.Y. 208, 210, 86 N.E.2d 564, 565. The generally stated standard is that the showing of business conduct, regular and continuous, is essential to bring a foreign corporate plaintiff within the operative provisions of the "doing business" statute. See Penn Collieries Co. v. McKeever, 183 N.Y. 98, 103, 75 N.E. 935, 2 L.R.A.,N.S., 127. Or other cases have distinguished the "isolated transactions" of a foreign corporation from "an enterprise of some permanence and durability." See, e. g., Franklin Enterprises Corp. v. Moore, 34 Misc.2d 594, 226 N.Y. S.2d 527 (1962). The aforementioned case involved an unqualified foreign corporation which had executed only two contracts in New York. It was held that the corporation was doing business in New York rather than engaging in an isolated transaction since the corporation had also advertised in the New York papers and employed a New York answering service. Therefore, the proper inquiry is not the quantitative measure of contracts involved but the general plan to do business within that state. See Mahar v. Harrington Park Villa Sites, 146 App.Div. 756, 131 N.Y.S. 514 (1911). Defendant cites the case of Conklin Limestone Co. v. Linden, 22 A.D.2d 63, 253 N.Y.S.2d 578 as controlling on the particular issue now under discussion. In *Conklin* the plaintiff was a Connecticut corporation which was engaged in the business of crushing limestone for agricultural use. Most of its output was in the form of bulk sales. These mate-rials were transported to the farms in vehicles equipped with a spreading device by means of which trained corporate employees applied the limestone to the farmlands for fertilization purposes. In 1961 plaintiff received 351 orders from New York, delivered 7,500 tons of lime which represented approximately 30% of its total sales. Plaintiff did participate in a conservation program wherein materials and services were furnished New York farmers, but the foreign corporation employed no salesmen in New York, and maintained no office there. Occasionally an officer of the corporation would examine a regional farm, at the owner's request, to determine the "spreadability" of the bulk lime. The contracts sued upon in *Conklin* were made in New York. On appeal the court upheld the lower court's decision that plaintiff was, within the purview of the New York statute, doing business in New York. This case is marked by a number of factors which taken together make *Conklin* distinguishable from the instant case. (1) 30% of plaintiff's total sales went into New York in one year. (2) The foreign corporation as a regular part of its sales sent trained employees to help in spreading the lime. (3) The contract sued upon was made in New York. The New York courts have often emphasized that the place of making the contract is of great importance in deciding whether a corporation is doing business in a state. See James Talcott, Inc. v. J. J. Delaney Carpet Co., 28 Misc.2d 600, 213 N.Y.S.2d 354; Samuels v. Mott, 29 Misc.2d 705, 211 N.Y.S.2d 242. Plaintiff cites as controlling authority the case of Samuels v. Mott, *supra*, which was an action brought in New York by Admiral Credit Corp., a Delaware corporation with headquarters in Chicago, on 16 promissory notes. The notes arose under a letter of credit situation whereby Admiral appliances were transferred from a New York seller to a New York buyer, the seller being paid by Admiral Credit and transferring the note and statements of trust receipts back to Admiral Credit. In holding that Admiral

Credit was not doing business within New York, the court stated:

> "Doing business" * * * has been held by our Courts to be something more than having contact with a New York resident. * * * [T]he court is mindful of the fact that Admiral Credit derived a great deal of business from its contacts in New York State and that the method of signing the notes in question was unusual. However, Admiral Credit has no office in New York and sold no products in the State. The essential elements in the transaction, acceptance of the papers signed by the defendant and signing of the notes all took place without the State of New York. The fact that Admiral Credit dictated to its wholesale distributors the method of operation and often sent employees into the state to check on its wholesalers and their retailers doesn't change the basic nature of the transaction.

A case of this nature places the Court somewhat at the mercy of the attorneys for the respective parties, for this Court can claim little, if any, expertise in interpreting New York law. Therefore, the Court has placed much reliance upon the parties to come forth with the relevant New York law which is controlling as to this particular issue.

■■■ There is no question but that plaintiff was doing business within the jurisdictional sense of *International Shoe* and other such cases. However, there is a real doubt as to whether plaintiff is doing business under the New York law in a qualification sense. The approach of the *Samuels* case is convincing, for therein the court examined the "basic nature of the transaction" and did not grasp upon what might be deemed incidental elements of the business. The cases cited by defendant are distinguishable and do not tend to refute the teachings of the *Samuels* case. Moreover, it cannot be overlooked that the defendant does have the burden of proof on this factual question of incapacity to sue. Within the meaning of the above cases, it would seem that the main thrust of the business dealings of Textile Banking Company occurred in New York. Admittedly, agents and officers of plaintiff made a number of visits to Georgia. But these visits do not seem to have been a part of a regular scheme of supervision as was true in the *Conklin* case. The essential elements in the transactions between Textile Banking Company and its Georgia customers occurred outside the state of Georgia. Moreover, defendant's contention that plaintiff was engaged in a general course of loaning money in Georgia is not supported by the record as presently developed. The mere fact that Georgia clients owed plaintiff $3,085,800. in one year and $1,912,200. in the next does not establish that plaintiff was engaged in loaning money within the state of Georgia. If proof was offered that plaintiff made these loans in Georgia, then defendant would be on firmer ground but lacking proof on this point, it should not be considered in greater detail. See Affidavit of David Johnson, paragraph 10. Accordingly, defendant's motion to dismiss can not be granted on this ground.[5] The approach taken by the Court is strengthened by reference to another New York statute, not cited by either of the parties.[6]

---

5. The above analysis of the New York law and the holding therefrom makes it unnecessary for this Court to go fully into plaintiff's interstate commerce contentions. However, a recent case from this circuit which has numerous similarities with the instant case did more fully discuss this issue. Moreover, the result reached in that case lends considerable support for the conclusions reached by this Court in the instant case. See National Acceptance Co. of America v. Ala-

bama Gravel Company, Civil Action No. 64–484 (N.D.Ala. March 8, 1965), affirmed per curiam by the Fifth Circuit in 369 F.2d 406 (December 12, 1966).

6. Title 22 of the General Corporation Law of New York, McKinney's Consol.Laws, c. 23, in § 218 provides: A foreign corporation, other than a moneyed corporation, doing business in this state shall not maintain any action in this state upon any contract made by it in this state, un-

(2) Defendant contends that the alleged charge backs of accounts receivable are taxable to plaintiff under § 92–121. As a result of this failure to file an intangible tax return and by its statement through its counsel that it was not going to do so bars its right to sue under § 92–125 which provides:

Failure to make return bars suit.— *Wilful failure* to list any property with the State Revenue Commissioner for taxation as required by the terms of this law [§§ 92–113 to 92–159, 92–9946] shall be a bar to any action upon the same in any court and may be pleaded as a complete defense; but the holder thereof may at any time pay all taxes, penalties and accrued interest, including the 25 per cent. penalty provided in this law, and thereupon, without dismissal of the original suit, be relieved from the penalty above provided.

Defendant contends that plaintiff was subject to taxation under the terms of § 92–121.

Persons subject to tax on intangibles. —Every resident or nonresident person, including partnerships whose members are in whole or in part non-residents of this state, is declared to be subject to the tax imposed in this law [§§ 92–113 to 92–159, 92–9946] on so much of his property taxable under sections 92–116 to 92–122 as shall have been acquired in the conduct of, or used incident to, business carried on or property located in this State. Each such person shall report such property and pay taxes thereon as provided by law for citizens of this State.

Defendant's argument continues as follows. The tax situs for the accounts receivable was established at the time of the creation of the debt. At the time of the assignment, no tax was due on the accounts. On January 1, 1965, the plaintiff owned the accounts and therefore it was the party liable for making of the return and the payment of the tax. The factoring contract provided for the paying of taxes that accrued prior to the sale of the accounts by the defendant, but it does not provide for the payment of any taxes by the defendant after the accounts have been sold and the title vested in the plaintiff. This Court cannot agree with defendant's construction of the Factoring Agreement. This agreement provides: "Banker [plaintiff] shall not be liable for *any* selling expenses, orders, purchases, contracts or taxes in connection with Accounts or otherwise except as expressly provided herein." The Court takes this to mean that the parties contemplated that the plaintiff would not be responsible for any taxes accruing on the account. This is the plain meaning of this language. The strained interpretation urged by defendant cannot be accepted. Accordingly, under the terms of the agreement between these parties, the plaintiff did not, on the sale of the accounts, take on the responsibility for the payment of taxes on that property. If the tax is owed, it is payable by the defendant and *not* the plaintiff. Regardless of the state's rights against plaintiff for any tax, it would be grossly unfair to apply the drastic prohibition of § 92–125 and deny this plaintiff access to the court against this defendant.[7]

less before the making of such contract it shall have obtained a certificate of authority. This prohibition shall apply also to any successor in title of such foreign corporation and to any person claiming under such successor of such foreign corporation or under either of them.

7. The inquiry might also be raised as to whether a failure to pay the tax by one who in good faith contends that he is not even subject to the tax would be a

"wilful" failure to pay the tax within the meaning of § 92–125? Possibly this person knew of the existence of the tax but didn't know that it was applicable to him. The barring of a foreign corporation from our courts is a harsh remedy. This Court would hesitate to rule as a matter of law that the element of wilfullness is present as would be required in this case to bar the plaintiff on this ground.

(3) Finally, defendant contends that plaintiff has been lending money in Georgia as a "bank" without a permit from the Georgia Superintendent of Banks as required in § 13–9907 and therefore should be barred from bringing an action arising out of an illegal act. This Court cannot accept this argument for a number of reasons. First, Defendant has not established that plaintiff has loaned money in Georgia. Furthermore, it would seem very doubtful that plaintiff's activities, even if occurring in Georgia, would bring plaintiff within the purview of § 13–201. If so, any money lender, private or corporate, might be denied access to the courts on the grounds that he or it is a "bank".

Accordingly, the defendant's motion for summary judgment on the grounds stated is denied.

It is so ordered.