**OLIVER PROMOTIONS LIMITED,**
**Plaintiff,**

v.

**TAMS–WITMARK MUSIC LIBRARY,**
**INC. and Stage Musicals, Ltd.,**
**Defendants.**

**No. 79 Civ. 4806(PNL).**

United States District Court,
S. D. New York.

March 31, 1982.

Carroll Neesemann, Kim J. Landesman, Parker, Auspitz, Neesemann & Delehanty, Jonathan Siegfried, Paul, Weiss, Rifkind, Wharton & Garrison,

Robert King, Debevoise, Plimpton, New York City, for defendants.

## OPINION AND ORDER

LEVAL, District Judge.

This is an action for breach of contract brought under this court's diversity jurisdiction. Plaintiff Oliver Promotions Ltd. is a corporation organized and doing business in London, England; defendant Tams-Witmark Music Library, Inc., (Tams-Witmark) is a corporation organized in New York and doing business in New York City; and defendant Stage Musical, Ltd., (Stage) is a corporation organized in New York and doing business in Rye, New York. The complaint alleges that defendants breached the terms of two agreements, that defendants wilfully and maliciously converted moneys belonging to plaintiff, and that defendants violated their fiduciary duties to plaintiff. Defendants move for dismissal under Fed. R.Civ.P. 12(b), on the ground that plaintiff is doing business in New York without having obtained the requisite authorization,

and thus is barred from maintaining a suit by N.Y.Bus.Corp.Law § 1312(a).[1]

*Facts*

In 1964, Lionel Bart, the English author of the play, *Oliver!*, by contract authorized defendant Tams-Witmark to license amateur and stock performances of the play in the United States and Canada. This contract was assigned by Bart to plaintiff pursuant to a 1962 agreement. Plaintiff "is engaged in the business of exploiting the music and dramatic rights to the musical play 'Oliver!' . . . on a world-wide basis as well as financing and producing other stage plays." Affidavit of Derek J. Dawson ¶ 3. Defendant Tams-Witmark entered into a second contract in 1967 with plaintiff, which was Bart's successor in interest. That contract authorized defendant Tams-Witmark and its assignee defendant Stage to license amateur performances in the United Kingdom and Ireland. Both of these agreements were negotiated in London. As of 1981, plaintiff has received from defendants some $1,240,000 of which New York productions account for $81,000. Affidavit of Louis H. Aborn ¶¶ 8, 20. The rights to license first-class performances of the play are held by Hemdale Associates (U.K.) Ltd. (Hemdale U.K.), a corporation organized in and doing business in England. Cameron MacKintosh Production Ltd. is Hemdale U.K.'s agent.

Both plaintiff and Hemdale U.K. are subsidiaries of Perben Group Ltd., which in turn is wholly owned and controlled by The Hemdale Film Group Ltd. In addition to plaintiff and Hemdale U.K., The Hemdale Film Group Ltd. owns and controls at least nine other English subsidiaries and two American subsidiaries, the latter being Manhattan Promotions Inc. and Hemdale Leisure Corp. (USA) (Hemdale Leisure). Hemdale Leisure is a Delaware corporation with offices in Los Angeles and New York, and is licensed to do business in New York.

The Hemdale Film Group Ltd. is controlled by Derek Dawson and John Daly, who between them own at least three-quarters of its stock. Dawson and Daly are executive directors of most of the English subsidiaries including plaintiff and Hemdale U.K. They are also executive directors of Hemdale Leisure; until 1979, Frederick Schneier was vice-president and generally in charge of Hemdale Leisure's day-to-day activities. Lawrence Friedricks has since replaced him.

Under the 1964 and 1967 contracts, defendants are obligated to pay plaintiff between ten and twenty percent of the royalties defendants receive from their sublicensing activities. Defendants undertook to use their best efforts to maximize the royalties. In addition, the contracts permit defendants to charge and keep any reasonable rental fees for scripts, scores, and other such materials they provide. The underlying issue in this action is plaintiff's allegation that defendants "were charging unreasonably high rentals and arbitrarily low royalties, were improperly allocating between royalties and rentals on their books, and were thereby retaining as 'rentals' amounts that should be paid to [plaintiff] Oliver as 'royalties.'" Plaintiff's Memorandum in Opposition at 7.

Plaintiff alleges that in 1976, it became suspicious of defendants' activities and decided to audit defendants' books and records pertaining to the play. The 1964 and 1967 contracts give it the right to do so. In September 1976, Daly and Schneier met with defendants' President and Executive Vice-President, Louis Aborn and Robert Hut, in New York. Although the topics of discussion at the meeting are disputed, both parties agree that the possibility of extending defendants' rights worldwide and of a sale of those rights to defendants were discussed. It is unclear who had requested the meeting. A second meeting was held in November 1976 at the offices of either

---

1. A foreign corporation doing business in this state without authority shall not maintain any action or special proceeding in this state unless and until such corporation has been authorized to do business in this state and it has paid to the state all fees, penalties and franchise taxes for the years or parts thereof during which it did business in this state without authority. This prohibition shall apply to any successor in interest of such foreign corporation.
N.Y.Bus.Corp.Law § 1312(a) (McKinney 1963).

Hemdale Leisure or defendant Tams-Witmark. At that time, discussions were held concerning royalty payments, the planned audit, and the possibility of defendant Tams-Witmark restricting its licensings in areas so that a first-class production of the play licensed by Hemdale U.K would have greater success. No resolution of these issues was reached.

Plans for the audit proceeded. In an internal memo from Dawson to Schneier, Hemdale Leisure was formally authorized by plaintiff to conduct the audit of Tams-Witmark. Dawson had chosen the firm of Solomon & Finger to conduct the audit. This authorization was transmitted to defendant Tams-Witmark by letter on December 15, 1976. For disputed reasons, the audit took a considerable amount of time to complete. On October 18, 1977, Daly wrote to Aborn a letter containing the following sentence: "it would be helpful if, until further notice you would deal with Fred Schneier on all matters relating to 'OLIVER' in the U.S." Exhibit 20, Appendix B to Plaintiff's Memorandum in Opposition. The letter was typed on stationery of The Hemdale Film Group Ltd. Defendants contend that this sentence gave Hemdale Leisure full authority to act for plaintiff in the United States on any matter. Affidavit of Mary Jo White ¶ 50. Plaintiff contends that the sentence confers no authority at all and only requests that Schneier be treated as the conduit for information concerning the audit which he was overseeing. Affidavit of Jonathan Siegfried ¶ 20 (citing Testimony of John Daly at 52 (Daly wanted communications on audit "to be passed through ... Mr. Schneier or copies to Mr. Schneier, at least, so while the audit and the dispute was going on, he would at least have the same information that was being passed to me and he could, if they wanted any quick decision, ... pass them on to me for consultation with Mr. Dawson and we would say yes or no."))

At certain times between 1977 and 1979, Schneier attempted to secure contracts for first-class productions of the play in the United States for Hemdale U.K. At the request of Daly and Dawson, Schneier met with David Merrick and another producer whose name Schneier could not recall. Affidavit of Mary Jo White ¶ 55 (quoting Testimony of Frederick Schneier at 55–56). Neither meeting led to agreement, but the meeting with Merrick did proceed to a draft contract. Section 3 of the draft required the producer, Merrick, to present the play in a first-class theatre in New York City before December 15, 1979. Exhibit 65, Appendix B to Plaintiff's Memorandum in Opposition (Bates No. 1904–1905). In 1978, Stephen Oliver was hired by Daly to work on at least three projects: two movies and the play. His duties on the play included interesting producers in presenting a first-class production of the play. Although Oliver worked for Hemdale U.K., he was paid with checks drawn on a Hemdale Leisure account. In his efforts, he had meetings with one producer in New York and one in Washington, the latter concerning a production at the Kennedy Center. After Schneier left Hemdale Leisure in 1979, Dawson, Daly, and Fredericks met another producer, Ron Delsener, in New York sometime in 1980. Finally, some negotiations in 1981 resulted in the signing of a contract between Hemdale U.K. and Oliver III Production Company, a limited partnership unconnected with The Hemdale Film Group Ltd. Although the affidavits conflict, the only deposition testimony cited states that the negotiations for this contract were conducted in London. Plaintiff's Memorandum in Opposition (exhibit U) (Testimony of Derek Dawson at 330–39); *id.* (exhibit G) (Testimony of Mackintosh at 274); *see* Affidavit of Mary Jo White ¶¶ 60–61.

*Discussion*

The issues before me are whether plaintiff is "doing business" in New York within the meaning of N.Y. Bus. Corp. Law § 1312(a), and if so, whether section 1312(a) can be applied constitutionally to bar plaintiff's action. Because I determine that plaintiff is not doing business in New York under section 1312(a), I do not reach the constitutional issue. *See Ayer v. General*

*Dynamics Corp.*, 82 F.R.D. 115, 119 n.7 (S.D. N.Y.1979) (Pierce, J.).[2]

█ A foreign corporation is presumed to be doing business in its home jurisdiction. *Great White Whale Advertising, Inc. v. First Festival Productions*, 81 A.D.2d 704, 706, 438 N.Y.S.2d 655, 658 (1981). The defendant seeking to invoke section 1312(a) to terminate a suit by its adversary bears the burden of establishing that the plaintiff has not met the section's requirements. *Textile Banking Co. v. Colonial Chemical Corp.*, 285 F.Supp. 824, 828 (N.D.Ga.1969); *Dixie Dinettes, Inc. v. Schaller's Furniture, Inc.*, 71 Misc.2d 102, 103, 335 N.Y.S.2d 632, 635 (App.Div.1972). Determinations of doing business must be made on a case-by-case basis. *Conklin Limestone Co. v. Linden*, 22 A.D.2d 63, 64, 253 N.Y.S.2d 578, 580 (1964).

In claiming that plaintiff is doing business under section 1312(a), defendants point to the following factors: (1) plaintiff has continuously received a substantial portion of its income from royalties generated by licensings by defendants,[3] (2) plaintiff has sought to enhance its income through an audit of defendants conducted by Solomon & Finger and supervised by Frederick Schneier of plaintiff's sister company, Hemdale Leisure; and (3) plaintiff continuously sought to mount a first-class production of the play in New York from 1977 through Schneier and Hemdale U.K., whose executive directors, Daly and Dawson, are also directors of plaintiff. Plaintiff responds that (1) defendants cannot attribute their own acts to plaintiff in order to show that plaintiff has been doing business in New York; (2) actions taken to enforce contractual rights and actions taken in anticipation of or in preparation for litigation are not doing business; and (3) the negotiations for a first-class production of the play do not amount to doing business, and if they do, they were conducted by Hemdale U.K., which holds the rights to such productions.

█ Putting to the side defendants' activity in New York in sublicensing the play, plaintiff's activities in the state do not constitute doing business. Defendant must show that plaintiff has "maintained and carried on a regular and continuous course of business conduct in New York." *Manhattan Fuel Co. v. New England Petroleum Corp.*, 422 F.Supp. 797, 801 (S.D.N.Y.1976), aff'd, 578 F.2d 1368 (2d Cir. 1978) (Duffy, J.); *see Stafford-Higgins Industries, Inc. v. Gaytone Fabrics, Inc.*, 300 F.Supp. 65, 66 (S.D.N.Y.1969) (Weinfeld, J.) (New York courts "have consistently held that to be 'doing business' with resulting invocation of the ban of the statute, 'the foreign corporation must do more than make a single contract, engage in an isolated piece of business, or an occasional undertaking; it must maintain and carry on business with some

---

2. On the constitutional issue, plaintiff states that, even if it is doing business in New York under section 1312(a), that section should not be applied because plaintiff's business is interstate or foreign commerce. Defendant responds that plaintiff's business is intrastate in substantial part and that any interstate aspects can be separated from intrastate activity.

Judge Pierce, in *Ayer v. General Dynamics Corp.*, 82 F.R.D. 115, 119 n.7 (S.D.N.Y.), noted that *Grand Bahama Petroleum Co. v. Asiatic Petroleum Corp.*, 550 F.2d 1320 (2d Cir. 1977), "reflects what appears to be growing disenchantment with the application of state 'door closing' statutes such as [N.Y.Bus.Corp.Law] § 1312 to diversity suits ... especially when these involve interstate commerce." Although there are several grounds for the decision in *Grand Bahama Petroleum Corp.*, the court did state that "[e]ven if [N.Y.Bus.Corp.Law] § 1312(a) may be described as affecting the district court's jurisdiction, New York may not place such a financial and procedural burden on a foreign corporation seeking to vindicate its right to bring a diversity action before the federal courts," 550 F.2d at 1324, and that, under *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 118 (1938), because a New York resident is not subject to section 1312(a), "the offending local statute must give way ... [i]f a nonresident is to receive the same relief as a resident of New York in a federal diversity suit." 550 F.2d at 1325. Because of my finding that plaintiff is not doing business in New York under N.Y.Bus.Corp.Law § 1312(a), I do not decide the application of the constitutional holding in *Grand Bahama Petroleum Co.* to this case.

3. Only $81,000 of $1,240,000 in royalties paid by defendant Tams-Witmark to plaintiff was derived from wholly intrastate productions in New York. Affidavit of Louis H. Aborn ¶¶ 8, 20.

continuity of act and purpose.' ") (quoting *International Fuel & Iron Corp. v. Donner Steel Co.*, 242 N.Y. 224, 230, 151 N.E. 214, 215 (1926)). Defendants have shown two business contacts in New York: the first was in September 1976, when Daly and Schneier discussed with defendants the possibility of either extending defendants' licensing rights worldwide or selling plaintiff's rights in total to defendants; the second contact was in November 1976, when a possible restriction of defendants' licensings was discussed. The activities surrounding the disputed royalty payments and the subsequent audit relate to the original contracts of 1964 and 1967 and do not amount to different business contacts in New York. The fact that plaintiff has continuously received a substantial portion of its income from a New York corporation does not, without more involvement, constitute doing business. *See Manhattan Fuel Co. v. New England Petroleum Corp.*, 422 F.Supp. 797, 802 (S.D.N.Y.1976), *aff'd*, 578 F.2d 1368 (2d Cir. 1978) ("[M]ere solicitation of in-state sales and delivery pursuant thereto do not constitute doing business within the meaning of § 1312.") Finally, the efforts of Daly, Dawson, Schneier, and Oliver in soliciting interested parties for a first-class production of the play are attributable to Hemdale U.K. Although Daly and Dawson are executive directors of plaintiff, they also hold similar roles with Hemdale U.K., and defendants have not demonstrated that they were negotiating on behalf of plaintiff's stock performances license, rather than on behalf of Hemdale U.K.'s rights in first-class performances.

Even if those persons were considered to be negotiating for plaintiff, three contacts in New York, with potential producers, none of which resulted in a contract, do not rise to the level of "doing business" in New York.

Defendants' argument, then, is dependent on its success in imputing its own sublicensing activities to plaintiff. Only the 1964 contract permits defendants to sublicense productions of the play in New York.[4] Defendants concede that they are independent contractors and not agents of plaintiff, Defendants' Reply Memorandum at 20–21, but they argue "[e]ven an independent contractor's activities in New York may support a finding that an unlicensed foreign principal is conducting business in this State." *Id.* at 21. Defendants' activities are not controlled by plaintiff: defendants are free to contract with whomever they wish in the United States, Canada, Ireland, and the United Kingdom for stock performances of the play. Plaintiff does not direct defendants' solicitation or licensing activities; defendant's activities in New York are not required by plaintiff. *Cf. Galgay v. Bulletin Co.*, 504 F.2d 1062, 1065 (2d Cir. 1974) (despite absence of formal agency relationship, N.Y.Civ.Prac.Law § 302(a)(1) secures personal jurisdiction over defendant when independent contractor was "in New York at the request and for the business purposes of" defendant.)[5]

■ Even if defendants were considered to be plaintiff's agents, the rule in New York is that a plaintiff-agent may not

---

**4.** The 1964 contract gave defendants the right to sublicense performances in the United States and Canada. I assume, for the purposes of this motion, that most of the productions actually sublicensed under the agreement were performed in New York. Defendants claim to have licensed approximately 750 productions of the play in New York.

**5.** Defendants cite *Gelfand v. Tanner Motor Tours, Ltd.*, 385 F.2d 116, 120–21 (2d Cir. 1967), *cert. denied*, 390 U.S. 996, 88 S.Ct. 1198, 20 L.Ed.2d 95 (1968), for the proposition that a defendant may be sued in New York if an independent contractor provides services, beyond "mere solicitation," that the defendant

itself would have to have its own officials conduct. The Court of Appeals based its decision on *Frummer v. Hilton Hotels International, Inc.*, 19 N.Y.2d 533, 537, 227 N.E.2d 851, 854, 281 N.Y.S.2d 41, 44, *cert. denied*, 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967). In that case, however, the New York Court of Appeals found personal jurisdiction over a defendant whose sister corporation provided reservation services in New York at little or no profit. *Id.* at 538, 227 N.E.2d at 855, 281 N.Y.S.2d at 45. The Court of Appeals in *Galgay v. Bulletin Co.*, 504 F.2d 1062, 1065 (2d Cir. 1974), did not cite *Frummer* or *Gelfand*; I, however, will follow the imputation rule as stated in *Galgay*.

rely on its own activities to establish personal jurisdiction over a defendant-principal. *Haar v. Armendaris Corp.*, 31 N.Y.2d 1040, 294 N.E.2d 855, 342 N.Y.S.2d 70 (1973), *rev'g* 40 A.D.2d 769, 337 N.Y.S.2d 285 (1972) (on dissenting opinion); *see Mayes v. Leipziger*, 674 F.2d 178 at 181 n.2 (2d Cir. 1982) ("New York law appears to hold that an agent cannot predicate the court's long-arm jurisdiction over his principal solely on his own activities as agent within the state."); *Loria & Weinhaus, Inc. v. H.R. Kaminsky & Sons, Inc.*, 80 F.R.D. 494, 498 (S.D.N.Y.1978) ("[P]laintiff cannot, by virtue of its own acts in New York, bootstrap jurisdiction by imputing those acts to defendant."); *Pneuma-Flo Systems, Inc. v. Universal Machinery Corp.*, 454 F.Supp. 858, 862–63 (S.D.N.Y.1978) (despite criticism of rule, it is law in New York). Although all the cases cited in this and the preceding paragraph consider personal jurisdiction under N.Y.Civ.Prac.Law §§ 301–302 and although these sections involve constitutional considerations different from those of 1312(a), *Great White Whale Advertising, Inc. v. First Festival Productions*, 81 A.D.2d 704, 706, 438 N.Y.S.2d 655, 658 (1981), defendants have not contended that their showing may be any less than that required by N.Y.Civ.Prac.Law §§ 301–302. I conclude that defendants may not impute their activities under the 1964 and 1967 contracts to plaintiff for the purpose of demonstrating that plaintiff is doing business under section 1312(a). Based on the foregoing, I find that defendants have not carried their burden.

Defendants' motion to dismiss is denied.

SO ORDERED.